IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARY L. HODGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:04cv1233-SRW |
| | ) | WO |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

Mary L. Hodges brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On October 19, 2001, plaintiff filed an application for disability insurance benefits. On January 8, 2003, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on February 17, 2003, in which he found that plaintiff is not disabled within the meaning of the Social Security Act. On October 27, 2004, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ erred in his evaluation of plaintiff's residual functional capacity, (2) the ALJ erred in failing to find that the plaintiff has severe physical impairments, (3) the ALJ erred in concluding that the plaintiff could perform her past relevant work, and (4) the ALJ erred in his evaluation of plaintiff's credibility. For the reasons set out below, the court concludes that the ALJ did not err and his decision is due to be affirmed.

1.      Residual Functional Capacity

Plaintiff contends that the ALJ failed to consider the evidence as a whole in determining her residual functional capacity (RFC), "particularly with respect to her mental restrictions." Plaintiff's brief at 11. Specifically, plaintiff argues that the ALJ improperly relied on the opinion of Dr. Donald Hinton, a non-examining agency psychologist, in determining that plaintiff had only minimal limitations. She cites evidence from Leonard Smolinski (a treating licensed professional counselor), Dr. Keith VanderZyl (a consultative medical examiner), Dr. J. Walter Jacobs (a consultative psychological examiner), and Dr. Kenneth Fineman (a forensic psychological examiner appointed by a California juvenile court), which she contends supports her claim that she is totally disabled.

The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (20 CFR § 404.1545(a)). Along with her age, education and work experience, plaintiff's residual functional capacity is considered in determining whether she can work. Id. (citing 20 CFR § 404.1520(f)). The court finds no merit in plaintiff's contention that the ALJ failed to consider the evidence provided by Smolinski, VanderZyl, Jacobs, and Fineman, and improperly relied on the opinion of Dr. Donald Hinton concerning her RFC.

Leonard Smolinski

While it is true that the ALJ did not consider the letter and treatment notes of Leonard Smolinski, this evidence was not before the ALJ – and, in addition, it is not properly before

3

the court. These records were not provided to the ALJ, only to the Appeals Council. See R. 9; R 353-365. Plaintiff has not appealed the Appeals Council's decision denying review, nor does she contend in her brief that the court should remand for consideration of new evidence pursuant to the standard set out in Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir.1998). Thus, the court may look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence. Id. at 1323; see also Fry v. Massanari, 209 F.Supp.2d 1246, 1252 (N.D. Ala. 2001). The court notes further that the ALJ rendered his decision on February 17, 2003, but the Smolinski letter to which plaintiff refers is dated March 30, 2004, and the progress notes bear dates from June 4, 2004 through August 26, 2004. R. 353. The letter and progress notes do not appear to the court to address plaintiff's condition during the period for which benefits were denied.

### Dr. Keith VanderZyl

Plaintiff's contention that the ALJ did not consider Dr. ZanderZyl's findings is belied by the record. R. 22-23. Instead, the ALJ considered but rejected Dr. ZanserZyl's conclusions concerning plaintiff's mental health. Dr. ZanderZyl examined plaintiff on January 14, 2002. After a thorough orthopedic examination, he noted nothing in plaintiff's spine, legs, vascular status, neurological status, laboratory or x-rays that was physically disabling. However, Dr. ZanderZyl was concerned about plaintiff's "confabulation" – that is, her somewhat bizarre account of her medical history, which the doctor did not consider credible. Dr. ZanderZyl indicated that "[t]he patient has taken herself off of her current 3 anti-psychotic medications and is relapsing. She has been hospitalized twice before,

involuntarily[,] for this and is well on her way towards a third relapse." R 283. He wrote, "In my impression this lady is totally disabled and severely in need of seeing mental health."

The ALJ discussed Dr. VanderZyl's conclusions as follows:

> Dr. Vanderzyl opined on January 14, 2002, that the claimant was totally disabled and severely in need of seeing mental health (Exhibit 10F). I give little weight to Dr. Vanderzyl's opinion. The doctor's opinion appears to rest on his assessment of a mental impairment which is outside the doctor's area of expertise. Although the doctor stated that the claimant is 'totally disabled,' it is not clear that the doctor is familiar with the definition of 'disability' contained in the Social Security Act and regulations. Moreover, the doctor's opinion contrasts sharply with the other evidence of record, which renders it less persuasive.
>
> In this regard, the record does not contain any other opinions from treating or examining physicians/psychiatrists/psychologists indicating that the claimant is disabled or even has limitations greater than those determined in this decision. For example, the claimant's treating psychiatrist, Dr. Hicks offered a global assessment functioning (GAF) score of 65 on September 25, 2000 (Exhibit 4F). According to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, a GAF of between 61 and 70 represents: "*Some mild symptoms* (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships. Dr. Hicks offered a GAF score of 55 on June 28, 2001 and on May 6, 2002 (Exhibit 4F). According to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, a GAF of between 51 and 60 represents: "*Moderate symptoms* (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

R. 22-23.

Substantial evidence supports the ALJ's account of the opinions of qualified mental health care providers concerning the plaintiff, and the views of specialists on issues within

their areas of expertise are given more weight than those of non-specialists. Kerwick v. Commissioner of Social Security, 154 Fed.Appx. 863, 864 (11th Cir. 2005).[1] Further, because Dr. ZanderZyl examined plaintiff on only one occasion, his opinion was not entitled to great weight. Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1160 (11th Cir. 2004). Finally, it is apparent from Dr. Hicks' May 6, 2002 clinic notes that by that date plaintiff was back on a treatment plan which included medication for her atypical psychosis. She was "in no acute distress"; her speech and thought processes were unremarkable; her associations and recent and remote memory were intact; she was experiencing no abnormal or psychotic thoughts; her judgment, attention span and concentration were adequate; and her mood and affect were euthymic. R. 310-11.

Dr. J. Walter Jacobs

Similarly, the ALJ did not fail to consider Dr. Jacobs' opinion, as plaintiff suggests. On the contrary, he discussed the results of Dr. Jacobs' consultative examination as follows:

> J. Walter Jacobs, Ph.D., performed a consultative psychological evaluation on December 13, 2001. A mental status examination found the claimant to be alert and fully oriented. She had driven herself to the evaluation. Her speech was normal in form, progress and content. There was no loosening of association or confusion. Affect was normal in the context of the interview. She was not overtly anxious, but did report feelings of anxiety in crowds of people. She seemed to describe some relatively *minor* social anxiety. She described variable quality sleep. She described her appetite as good. Energy was poor. She acknowledged some feelings of sadness, but denied any crying episodes or thoughts of suicide. She acknowledged feelings of thought

---

[1] In addition, the question of whether or not the statutory definition of disability is met is reserved for the Commissioner. See Heppell-Libsansky v. Commissioner of Social Security, 170 Fed.Appx. 693, 697 (11th Cir. 2006); 20 CFR § 416.927.

>control, thought broadcasting and thought insertion. She reported a history of auditory hallucinations, but denied any at present. She had also had visual hallucinations, but denied any at present. In summary, the claimant described symptoms consistent with a diagnosis of schizophrenia. The assessment of memory and cognition indicated a person of average intelligence (Exhibit 8F).

R. 19.

Despite these comments, plaintiff suggests that the ALJ failed to consider Dr. Jacobs' determination that plaintiff "continued to exhibit 'first ranked symptoms of schizophrenia ... she would be best served if a guardian were appointed to manage any financial resources.'" Plaintiff's brief at 11. This characterization of Dr. Jacobs' report is somewhat misleading. Dr. Jacobs actually wrote that plaintiff "describe[d] first ranked symptoms of schizophrenia and reported a history of auditory and visual hallucinations as well as delusional thinking. ... Based on Ms. Hodges' history of psychosis, it is felt that she would be best served if a guardian were appointed to manage any financial resources." R. 272. Further, although plaintiff described some feelings of thought control, thought broadcasting and thought insertion, she denied any auditory or visual hallucinations at the time of the examination. R. 270. Dr. Jacobs placed no limitations on plaintiff as a result of her mental health issues other than his suggestion that, because of her history of psychosis, she would be best served if a guardian were appointed to manage any financial resources. However, since the ALJ determined that plaintiff was not entitled to an award of benefits, he was not obliged to reach the question of whether she needed assistance in managing those benefits.[2] The court finds

---

[2] Dr. Jacobs' suggestion concerning appointment of a guardian to manage plaintiff's financial resources is discussed further, *infra*.

no error in the ALJ's review of Dr. Jacobs' report.

Dr. Kenneth R. Fineman

Plaintiff also suggests that the ALJ failed to consider Dr. Kenneth Fineman's "determin[ation] that [plaintiff's] 'hypersensitivity and fearfulness' appear to be 'debilitating in social and work situations,'" and his concern that plaintiff's GAF score of 55 "'suggests serious problems in [plaintiff's] behavior, emotionality, or thinking process are still present ....'" Plaintiff's brief at 11.  Again, this statement is misleading.  Dr. Fineman's report, prepared on November 4, 2002, is 20 pages long.  Plaintiff has partially quoted two brief portions of this report without acknowledging their context.

Dr. Fineman wrote, concerning plaintiff's MMPI-2 test results, that plaintiff's "response content suggests that she feels intensely fearful about many objects and activities. This hypersensitivity and fearfulness appear to be generalized at this point and may be debilitating in social and work situations." R. 320.  This does not constitute a statement by Dr. Fineman that plaintiff's ability to work was in fact restricted by her hypersensitivity and fearfulness at the time of his examination.  On the contrary, Dr. Fineman's report indicates that the tests which he administered were "probabilistic in that they generate hypotheses. They indicate how a person is most likely to be based on the obtained scores.  However, acceptance of a hypothesis should be based on the same information being confirmed by other sources, or by multiple tests."  R. 319.

In this case, Dr. Fineman's report reflects no further confirmation of the hypothesis that plaintiff's hypersensitivity and fearfulness might be debilitating in a work situation.

Instead, plaintiff's mother indicated that once plaintiff began taking medication for her depression and psychosis, her symptoms quickly disappeared and she returned to normal. R. 323. Her husband confirmed this view, describing plaintiff's current behavior in a way that Dr. Fineman acknowledged was "inconsistent with the hypotheses suggested by the psychological testing." R. 324. Plaintiff herself indicated that "[s]he recalled having fearful feelings, which stopped as soon as she started her medicine." R. 317. And, as Dr. Fineman wrote, "[i]t is noteworthy that [plaintiff's] present MMPI psychological testing does not indicate the presence of psychotic behavior, a further attestation to the effectiveness of her psychiatric treatment." R. 326.

Dr. Fineman's statement that plaintiff's GAF score of 55 "'suggests serious problems in [plaintiff's] behavior, emotionality, or thinking process are still present ....'" must also be understood in context. R. 326. The GAF score of 55 to which Dr. Fineman refers was assessed by her treating psychiatrist, Dr. Hicks, on May 6, 2002. R. 311. At that time, plaintiff was "very upset and angry about having lost her job." Id. Nevertheless, as noted above, Dr. Hicks found that plaintiff was "in no acute distress"; her speech and thought processes were unremarkable; her associations and recent and remote memory were intact; she was experiencing no abnormal or psychotic thoughts; her judgment, attention span and concentration were adequate; and her mood and affect were euthymic. R. 310-11.

Dr. Fineman simply appears to have considered plaintiff's GAF of 55 to be one of several questions or issues raised by her history which warranted caution. However, he also noted that the information available suggested that plaintiff's atypical psychosis was in

9

remission, and that "written information from ... Dr. Hicks[] suggests that she is doing so well that he needs to see her only one time per year," apparently "for maintenance only." R. 325. Dr. Fineman indicated that his own observations "are also quite positive and do not suggest inappropriate or unusual mental status." R. 326. He remarked that despite the "serious problems in [plaintiff's] behavior, emotionality, or thinking process" suggested by the GAF of 55, Dr. Hicks nevertheless "does not believe that they would interfere with her child care." Id.

Under these circumstances, the court cannot conclude that the ALJ failed to properly consider Dr. Fineman's report. He appropriately summarized that report as follows:

> Kenneth R. Fineman, Ph.D., performed an independent psychological evaluation on October 10, 2002. The claimant reported that she had been seeing her psychiatrist, Dr. Hicks, for three years. She was placed on Prolixin, Desyrel and Vistaril. Prior to taking her medicine she used to wake up and see shadows. She recalled having fearful feelings; however, all of this stopped as soon as she started her medicine. She was aware of the time and the day of the week. On the next visit, she was able to state her name, age, date of birth, marital status, and children's names and ages correctly. She was oriented to the specific place and purpose. Her short term memory was tested. She was asked to memorize three objects and then tell what they were in approximately five to ten minutes. She was able to do so. In terms of perception, Dr. Fineman noted no atypical thoughts or delusions. She denied auditory, visual, olfactory, or tactile hallucinations. There were no ideas of reference noted. She denied any current feelings of depression. No depressive behavior was noted. She had no problems with her sleep patterns. She maintained appropriate interests in engaging in pleasurable behaviors. She had a good appetite. She had a positive sexual interaction with her spouse. She denied any suicidal ideation. She admitted that she had responded positively to her medications. She showed no signs of bipolar activities. Concerning anxiety, there were no signs that she had increased respiratory rate, rapid pulse, excessive sweating, or problems with concentration. In terms of her cognition, she showed average understanding of circumstances and situations, and on occasion shows a rather concrete approach to many social situations. She does

>show average intellectual capacity. Using the DSM-IV criteria, Dr. Fineman
>offered the following diagnoses: generalized anxiety disorder and personality
>disorder (Exhibit 14F).

R. 20.

The ALJ also discussed the subject of plaintiff's GAF scores in his decision:

>[T]he claimant's treating psychiatrist, Dr. Hicks[,] offered a global assessment
>functioning (GAF) score of 65 on September 25, 2000 (Exhibit 4F).
>According to the Diagnostic and Statistical Manual of Mental Disorders, 4th
>Edition, a GAF of between 61 and 70 represents: "*Some mild symptoms* (e.g.,
>depressed mood and mild insomnia) OR some difficulty in social,
>occupational, or school functioning (e.g., occasional truancy, or theft within
>the household) but generally functioning pretty well, has some meaningful
>interpersonal relationships. Dr. Hicks offered a GAF score of 55 on June 28,
>2001 and on May 6, 2002 (Exhibit 4F). According to the Diagnostic and
>Statistical Manual of Mental Disorders, 4th Edition, a GAF of between 51 and
>60 represents: "*Moderate symptoms* (e.g., flat affect and circumstantial speech,
>occasional panic attacks) OR moderate difficulty in social, occupational, or
>school functioning (e.g., few friends, conflicts with peers or co-workers).

The ALJ's conclusions regarding Dr. Fineman's report and plaintiff's GAF scores reflect his

consideration of the evidence as a whole and are supported by substantial evidence. See also

R. 48-49.

Dr. Donald Hinton

Plaintiff's contention that the ALJ "erroneously relied on the opinion of Donald

Hinton, Ph.D., a non-examining Agency psychologist, who determined that [plaintff] had

only minimal limitations despite the substantial evidence to the contrary," Plaintiff's brief

at 11, is without merit. The ALJ discussed Dr. Hinton's findings as follows:

>The residual functional capacity conclusion reached by the psychologist
>employed by the State Disability Determination Service also supports a finding
>of 'not disabled.' At the initial level of the administrative review process, the
>state agency medical consultant, Donald E. Hinton, PhD., reviewed the

>documentary evidence and completed a mental residual functional capacity assessment on February 4, 2002. He indicated that the claimant had moderate limitations in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting. The medical consultant further elaborated on the preceding capacities by explaining his summary conclusions as follows: The claimant is able to understand and remember simple instructions; the claimant is capable of sustaining concentration for 2 hours, with normal breaks, while performing 1-2 step tasks; contact with the public should be casual. Instructions should be direct. Changes in the work environment should be infrequent and gradual (Exhibit 11F).

R.23. The ALJ did not give Dr. Hinton's conclusions greater weight that those of the treating and examining physicians. Instead, Dr. Hinton's views are consistent with the opinions of plaintiff's other physicians who specialize in mental health, and the ALJ's findings in this regard are, again, supported by substantial evidence.

2.      <u>Severe Impairments</u>

Plaintiff contends that "[t]he ALJ completely ignored all of the Plaintiff's physical impairments," and maintains that the ALJ should have deemed plaintiff's "plantar fascitis, hyperlordosis, degenerative arthritis, and migraine headaches" to be severe impairments and/or consider the limitations imposed by these impairments even if they are not deemed to be severe. Plaintiff's brief at 12.

"An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her

impairment is not so slight and its effect is not so minimal." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986); see also Williams v. Barnhart, 186 F.Supp.2d 1192, 1197 (M.D. Ala. 2002)(same).  To put this another way, "[t]he Act defines a non-severe impairment as an impairment or combination of impairments that 'does not significantly limit ... physical or mental ability to do basic work activities.'" Williams v. Barnhart, 140 Fed.Appx. 932, 934 (11th Cir. 2005) (20 C.F.R. § 404.1521(a)).

The ALJ considered and discussed medical records relating to the conditions noted above from Dr. Luna Sy (back pain, migraines), R. 19-21; Dr. Keith VanderZyl (neck and back pain), R. 19-20; Dr. J. Paul Maddox (back pain), R. 20; and Dr. Chet Vahovius (plantar fascitis), R. 21.  The court has carefully reviewed the relevant medical records, and it finds that no physician indicated that any of these conditions significantly limits plaintiff's ability to do basic work activities.  See, e.g., R. 198, 308 (migraines); R. 265-66; 338-342 (plantar fascitis and degenerative arthritis[3]); R. 282-83 (back pain); R. 332 (hyperlordosis).  Accordingly, the ALJ did not err in failing to conclude that these impairments were severe or that, even if non-severe, they rendered the plaintiff disabled when considered in combination with her other complaints.

3.     Past Relevant Work

---

[3] Plaintiff's brief does not cite any record evidence that plaintiff was diagnosed with degenerative arthritis within the period for which benefits were denied.  The only record of this condition located by the court is at R. 342, which reflects a brief notation relating to degenerative arthritis made on July 30, 2003, well after the ALJ issued his decision on February 17, 2003. Plaintiff has not sought remand for review of new evidence in this case, nor would consideration of this evidence materially affect the outcome if the case were to be remanded.

Plaintiff contends that the ALJ erred in determining that she could perform her past relevant work.  Specifically, plaintiff argues that the ALJ should have questioned plaintiff herself regarding the physical and mental demands of her past work and differentiated between the way these jobs are performed in the national and regional economy and the way that plaintiff actually performed these jobs.  Plaintiff also contends that Dr. Jacobs' opinion that she would be best served "if a guardian were appointed to manage any financial resources," R. 272, is inconsistent with the Vocational Expert's (VE) assumption that she could perform work which includes handling money.

The court concludes that the ALJ did not err as suggested by plaintiff.  The plaintiff bears the burden of proving her inability to perform her previous work.  Lucas v. Sullivan, 918 F.2d 1567, 1571 (11th Cir. 1990). She must demonstrate her inability to do the previous *type* of work that she held before, not merely the specific job or jobs which she actually held previously. See Martin v. Sullivan, 901 F.2d 650, 653 (11th Cir. 1990); Jackson v. Bowen, 801 F. 2d 1291, 1293 (11th Cir. 1986); Foxx v. Apfel, 2000 WL 1137221, *7 (S.D.Ala.2000). To conclude that the plaintiff can return to her past relevant work, the ALJ must find that she can perform the job duties and physical demands of her past relevant work, *either* as those duties and demands existed in the plaintiff's actual past job *or* in accordance with the duties and demands of the occupation as generally performed in the national economy. Love v. Apfel, 2000 WL 284269, *1 (S.D.Ala.2000). In this case, as in Love, the ALJ did not specifically address whether the plaintiff could perform the job duties of the positions plaintiff held in the past as she herself previously performed those jobs. Instead, the ALJ

14

implicitly found the plaintiff can perform these jobs as they are generally performed in the national economy – in this case, based on testimony concerning such jobs presented by the VE. R. 24-25; R. 54-58. This was a permissible approach.

Further, the VE's assumption that plaintiff could continue to handle money as a cashier, apartment manager or hotel clerk is not inconsistent with Dr. Jacob's suggestion that because of plaintiff's history of psychosis, a guardian might need to be appointed to manage any financial resources. The demands of a job requiring, for example, the computation of a bill or rent payment or the operation of a cash register are not necessarily the same as the skills needed to manage the expenditure of a benefits check prudently. Further, the ALJ found that plaintiff's medications have been effective in controlling her symptoms, and that "while taking her medications as prescribed she has been able to perform work at the substantial gainful activity level for the past seven years (1995-2001)." R. 24. In addition, plaintiff handles money regularly in her personal life. The ALJ found that plaintiff shops for personal needs twice a week, travels to the grocery store to purchase items there, and pays her own bills, among many other activities of daily living. R. 24; see also R. 131, 271. The ALJ did not err in concluding that plaintiff could perform her past relevant work.

4.   Credibility

Plaintiff maintains that the ALJ erred in finding plaintiff's testimony relating to her back pain and other subjective symptoms not to be credible. However, the ALJ did credit such symptoms to a large extent – that is, in determining her RFC, he assumed that plaintiff experienced mild to moderate pain, and suffered from the limitations set out in the mental

15

residual functional capacity assessment completed by Dr. Hinton.  R. 24.  The ALJ simply did not find plaintiff credible concerning the severity and extent of her pain and other limitations.  Instead, he concluded that plaintiff's "daily activities ... are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," R. 24, and her testimony of "disabling pain and functional restrictions is disproportionate to the objective medical evidence."  R. 23.

There is no question that it was proper for the ALJ to consider plaintiff's daily activities in assessing her credibility. See Dyer v. Barnhart, 395 F.3d 1206, 1212 (11th Cir. 2005); Johnson v. Barnhart, 268 F.Supp.2d 1317, 1328 (M.D. Fla. 2002) (citing 20 C.F.R. §§ 404.1529(c)(3)(i); 416.929(c)(3)(i); SSR 96-7p.). The ALJ's conclusion that those activities were inconsistent with plaintiff's complaints of totally disabling subjective symptoms and limitations was a specific and adequate reason for the ALJ to discredit plaintiff's testimony which was supported by substantial evidence.  See R. 38, 129-33, 271; see also Johnson, 268 F.Supp.2d at 1328; cf. Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (Where ALJ articulated specific reasons for failing to give a physician's opinion controlling weight, which included the physician's failure to account for claimant's diverse daily activities, the court declined to re-weigh the evidence and found no reversible error.).

Similarly, the ALJ's decision adequately explains his reasons for determining that plaintiff's testimony of disabling pain and functional restrictions is disproportionate to the objective medical evidence.  A clearly stated credibility finding should not be disturbed unless it is not supported by substantial evidence. MacGregor v. Bowen, 786 F.2d 1050,

1054 (11th Cir.1986). In this case, there is substantial evidence in the record that plaintiff's mental health problems are stable and controlled by medication, see, e.g., R. 47-48, and that, as the ALJ found,

> the record does not contain objective signs and findings that could reasonably be expected to produce the degree and intensity of pain and limitations alleged. There are no diagnostic studies to show abnormalities that could be expected to produce such severe symptoms. The physical findings in the record do not establish the existence of neurological deficits, significant weight loss, muscle atrophy, or other observable signs often indicative of protracted pain of the intensity, frequency, and severity alleged.

R. 23. With regard to plaintiff's back pain in particular, the record indicates that she has been treated with Celebrex and a recommended exercise program. The Celebrex "seemed to help," but plaintiff did not refill the prescription. R. 332. Thereafter, Dr. Maddox authorized an upper lumbar epidural and indicated that if plaintiff still did not improve, he would "see her back with a lumbar MRI." Id. However, there is no evidence in the record that plaintiff sought further treatment from Dr. Maddox, other than Dr. Luna's report that Dr. Maddox "sent her for physical therapy." R. 308. According to Dr. Luna, plaintiff's low back pain improved after this therapy. Id.

The court finds no error in the ALJ's analysis of the plaintiff's subjective complaints. So long as substantial evidence supports the ALJ's findings, as is the case here, the decision concerning the plaintiff's credibility is a function solely within the control of the Commissioner and not the courts. Sellers v. Barnhart, 246 F.Supp.2d 1201, 1213 (M.D. Ala. 2002); Daniels v. Apfel, 92 F.Supp.2d 1269, 1280 (S.D.Ala.2000).

## CONCLUSION

17

Accordingly, upon review of the record as a whole, the court concludes that the ALJ's decision is due to be AFFIRMED. A separate judgment will follow.

DONE, this 20th day of July, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE